UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SEAN WIDNER,

                Petitioner,                            Hon. Janet T. Neff

v.                                        Case No. 1:10-CV-1035

MARY BERGHUIS,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Widner's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Widner's petition be **denied**.


## BACKGROUND

Petitioner was charged in this matter with four counts of First Degree Criminal Sexual Conduct and three counts of Second Degree Criminal Sexual Conduct. (Trial Transcript, October 22, 2007, 4-5). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**A.C.**

In approximately 1990, when A.C. was "around six years of age," Petitioner began dating Lynda Huffman, A.C.'s mother. (Trial Transcript, October 24, 2007, 40-41, 65-67). Petitioner soon thereafter moved in with Huffman and A.C. (Tr. 41-42). Huffman later became pregnant with Petitioner's child.[1] (Tr. 41-42). After Huffman became pregnant, Petitioner began sexually assaulting A.C. on a regular basis. (Tr. 42-49). Specifically, Petitioner performed oral sex on A.C. and forced her to reciprocate. (Tr. 42-49). Petitioner later engaged in anal intercourse with A.C. (Tr. 42-49). A.C. did not report this abuse because she was afraid of Petitioner. (Tr. 46-47). Specifically, Petitioner threatened to kill A.C.'s mother and younger sister if A.C. told anybody about his actions. (Tr. 47). Petitioner's abuse of A.C. was discovered in 1997, however, when A.C.'s mother returned home from work earlier than expected one day and interrupted Petitioner's assault of A.C. (Tr. 49-51). When confronted by her mother, A.C. acknowledged that Petitioner had been sexually assaulting her for several years. (Tr. 51).

**Lynda Huffman**

Petitioner moved in with Huffman and A.C. in 1990. (Trial Transcript, October 24, 2007, 65-66). Huffman later became pregnant with Petitioner's child. (Tr. 67). Huffman was unaware that Petitioner was sexually assaulting her daughter until "around Father's Day" in 1997. (Tr. 67-75). On the day in question, Huffman arrived home from work earlier than expected. (Tr. 67-75). When she arrived home, Huffman walked to her bedroom only to discover that a "piece of wood or something [was] jammed underneath [the door] to hold it shut." (Tr. 68-69). When

---

[1] This child was a daughter named Elizabeth. (Tr. 66-67).

Huffman was unable to open the door she "started pounding on it."  (Tr. 69).  Petitioner eventually opened the door at which point Huffman realized that somebody had just exited the bedroom through the window.  (Tr. 69-70).  As Huffman ran through the house in an attempt to see who had been in the bedroom with Petitioner, she encountered A.C. entering the house.  (Tr. 70).  When confronted by her mother, A.C. informed her mother about Petitioner's behavior.  (Tr. 71).

Huffman then confronted Petitioner, who acknowledged that he had been sexually assaulting A.C. "over an extended period of time."  (Tr. 71-72).  Petitioner told Huffman that he sexually assaulted A.C. because Huffman "was so fat and because [she] was a bad mom, because [she] wouldn't give him sex, [and because she] was stupid."  (Tr. 72).  Huffman then contacted Petitioner's brother, James Widner, who shortly thereafter arrived at Huffman's residence.  (Tr. 72).  After speaking with Petitioner, James Widner departed with A.C. and her younger sister.  (Tr. 72).  Huffman did not report Petitioner to the authorities, but instead permitted him to continue visiting their daughter, Elizabeth.  (Tr. 72-75).  Huffman indicated that she was intimidated by Petitioner and scared of him.  (Tr. 85).

**James Widner**

On Father's Day in 1997, Widner received a telephone call from Lynda Huffman asking him to come to her house.  (Trial Transcript, October 24, 2007, 88-91).  Widner did so and after speaking with Huffman about her reason for contacting him, Widner spoke with Petitioner.  (Tr. 91-92).  Petitioner admitted to his brother that he had "molested" A.C.  (Tr. 92-93).  Widner did not contact the police because he believed that the decision whether to do so was for Huffman to make.  (Tr. 93-94).

3

**Erin McAlpine**

As of August 10, 2006, McAlpine was employed as a police officer for the City of Kentwood. (Trial Transcript, October 24, 2007, 101-02). On that date, Officer McAlpine was dispatched to speak with A.C. regarding a "criminal sexual conduct complaint." (Tr. 102). Officer McAlpine met with A.C. and her mother. (Tr. 102-03). A.C. described in detail the abuse to which she had been subjected. (Tr. 107-09). McAlpine recorded A.C.'s and Huffman's statements and forwarded the matter to the "detective bureau" for further investigation. (Tr. 103-04).

**Cynthia Sapp**

Sapp is Petitioner's sister. (Trial Transcript, October 25, 2007, 4). Sapp described a conversation she had with Petitioner in 2001 or 2002. (Tr. 5-7). Sapp sensed that Petitioner was experiencing "a lot of confusion" and was seeking "answers." (Tr. 5-6, 8). During this particular conversation, Petitioner asked Sapp "what the Bible meant by 'if your eye offends you, pluck it out, if your hands offends you, cut it off.'" (Tr. 5-6). Sapp explained to Petitioner that this verse concerned "temptations." (Tr. 6). Petitioner then asked his sister "what [she] thought if he was to be castrated." (Tr. 6).

**Michele Clark**

As of 2006, Clark was employed as a detective for the Kentwood Police Department. (Trial Transcript, October 25, 2007, 11-12). Clark was assigned to investigate the allegations that Petitioner sexually assaulted A.C. (Tr. 12-15). As part of her investigation, Detective Clark spoke with A.C., Lynda Huffman, James Widner, and Cynthia Sapp. (Tr. 12-14). Clark also contacted

4

Petitioner as part of her investigation.  (Tr. 15).  Petitioner declined to speak with Clark telling her simply, "whatever, do whatever you've gotta do."  (Tr. 15).

Following the presentation of evidence, the jury found Petitioner guilty of three counts of First Degree Criminal Sexual Conduct and three counts of Second Degree Criminal Sexual Conduct.  (Trial Transcript, October 26, 2007, 3-4).  As an habitual felon, Petitioner was sentenced to serve 40-60 years in prison.  (Sentence Transcript, January 9, 2008, 7-8).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I.      Defendant's rights to due process, to a fair trial and to the effective assistance of counsel were violated when the trial court refused to appoint substitute trial counsel for Defendant.

II.      Defendant received ineffective assistance of counsel when his counsel (1) was unprepared for cross-examination (2) failed to object to improper evidence and (3) failed to investigate and subpoena the witnesses Defendant had requested be called. Additionally, counsel was ineffective under *United States v. Cronic* by virtue of her absence and failure to communicate with Defendant during the critical pretrial period.

III.      Defendant's right to a fair trial was violated by the admission of propensity evidence consisting of the uncharged alleged incident in Washington state.

IV.      The trial court abused its discretion in failing to order an evidentiary hearing under *People v. Ginther*, in order to resolve factual issues pertaining to trial counsel's actions.

V.      The trial court abused its discretion in failing to appoint an investigator (or to approve fees) for the purpose of pursuing factual issues involved in this appeal.

VI.     The trial court erroneously scored certain of the judicial sentencing variables, specifically offense variables 2 and 5, and therefore erroneously denied the motion for resentencing.

VII.    Defendant's sentence was improperly enhanced on the basis of factual findings not found by the jury, i.e. the scoring of OV 2 and OV 5, contrary to his Sixth Amendment right to a jury trial and his Fourteenth Amendment right to due process.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Widner*, 2009 WL 1693492 at *1-2 (Mich. Ct. App., June 16, 2009). Asserting the same issues, Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Widner,* No. 139202, Order (Mich., Oct. 26, 2009). On October 22, 2010, Petitioner initiated the present action in which he asserts the claims identified above.

## STANDARD OF REVIEW

Widner's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists."  *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams,* 529 U.S. at

411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."

8

*Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.        Request for Substitute Counsel**

After the selection of a jury, but before the presentation of evidence, Petitioner moved the trial court to appoint him different counsel. (Trial Transcript, October 24, 2007, 4-7). Petitioner

requested this relief because he was unsatisfied with his attorney's efforts with respect to "investigation into the witnesses." (Tr. 7). Petitioner asserted that as a result of his attorney's inadequate preparation he was "not ready to go to trial." (Tr. 7-9). The trial judge questioned Petitioner's attorney, who indicated that she was prepared to begin the trial. (Tr. 10). Finding that Petitioner was simply engaging in "delaying tactics" and, moreover, that he was represented by a "very competent [and] very experienced" attorney, the trial judge denied Petitioner's request for the appointment of substitute counsel. (Tr. 11-12). Petitioner asserts that the trial judge improperly denied his request for new counsel, thereby entitling him to relief.

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to. . .the Assistance of Counsel for his defense." U.S. Const. amend. VI. While an "essential" element of this right is the right to be represented by "counsel of one's choice," the right to be represented by chosen counsel "is not absolute." *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007) (citing *United States v. Gonzales-Lopez*, 548 U.S. 140, 144 (2006)). To secure substitute counsel during trial, a criminal defendant "must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his attorney." *Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011).

When reviewing a trial court's denial of a motion for substitute counsel, courts must consider the following factors: (1) timeliness of the request; (2) adequacy of the court's inquiry into the defendant's complaint; and (3) whether the alleged conflict between defendant and counsel is so great that it results in "a total lack of communication preventing an adequate defense." *Mooneyham*, 473 F.3d at 291. The court must balance the defendant's right to counsel of his choice

10

with the public's interest in the prompt and efficient administration of justice.  *Id.*  An examination
of these factors reveals the following.

Petitioner's request, made after trial had begun, was untimely.  With respect to this
factor, the Sixth Circuit has observed that if the defendant's request "would necessitate a last-minute
continuance, the trial judge's actions are entitled to extraordinary deference."  *Henness*, 644 F.3d at
321.  This deference can be overcome "only if the trial court engages in an unreasoning and arbitrary
insistence upon expeditiousness in the face of a justifiable request for delay."  *Cobb v. Warden,
Chillicothe Correctional Inst.*, 2012 WL 688506 at *5 (6th Cir., Feb. 29, 2012) (quoting *United
States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009)).  The record contains no evidence that would
permit Petitioner to overcome such "extraordinary deference."  This factor, therefore, weighs against
Petitioner.

With respect to the adequacy of the trial court's inquiry into the matter, the trial court
"simply must allow a defendant the opportunity to explain the attorney-client conflict as he perceives
it."  *United States v. Marrero*, 651 F.3d 453, 465 (6th Cir. 2011).  Here, the trial judge questioned
Petitioner at length regarding the basis for his request.  The trial judge also questioned Petitioner's
counsel at length about Petitioner's concerns as well as her readiness to proceed with the trial.  This
factor likewise weighs against Petitioner.  *See Marrero*, 651 F.3d at 465.

Finally, as for whether the alleged conflict is so great that it results in "a total lack of
communication preventing an adequate defense," it must be remembered that "a defendant's
differences of opinions with his attorney do not create a complete breakdown of communication that
compromises his defense."  *Id.* at 466.  When questioned by the trial judge, Petitioner acknowledged
that he had communicated with his attorney, but simply disagreed with her tactics and trial strategy.

11

The Court discerns no evidence that the alleged conflict between Petitioner and his attorney was so great that it prevented counsel from adequately defending Petitioner.   The Michigan Court of Appeals rejected this particular claim, finding that:

> Defendant argues that the complete breakdown of the relationship between him and defense counsel justified the appointment of substitute counsel.   We disagree.  "[A] complete breakdown of attorney-client privilege or disagreement over whether a particular line of defense should be pursued may justify appointing new counsel.  But, "[a]bsent a bona fide irreconcilable dispute regarding, for instance, a substantial defense, disagreements regarding trial strategy do not constitute sufficient grounds for the appointment of successor counsel."  A review of the record reveals defense counsel and defendant had a difficult and strained relationship.  Despite this strained relationship, defendant failed to prove there was good cause to appoint substitute counsel because there is no evidence in the record that a legitimate dispute over a fundamental trial tactic or substantial defense existed.   Defendant never once asserted what substantial defense would have been presented or what fundamental trial tactic would have been different if he were represented by substitute counsel.  Even though defense counsel admitted before the second day of trial there was a complete breakdown of the relationship because of two grievances defendant filed against her, this breakdown occurred the day before and was a direct result of defendant's behavior in filing the grievances.  This cannot form the basis for good cause to appoint substitute counsel.  Additionally, a review of the record revealed that defendant's general dissatisfaction with defense counsel stemmed more from his attempts to control the proceedings and his attempts at manipulation, rather than a legitimate difference opinion over a substantial defense or fundamental trial tactic.   Based on these reasons, there is no support that the trial court's decision to deny defendant's requests for substitute counsel fell outside the principled range of outcomes.
>
> Defendant also alleges that the fact that defense counsel failed to meet with defendant to discuss the defense strategy justified the appointment of substitute counsel.  "Defendant may not leave it to this Court to search for a factual basis to sustain or reject his position."  Defendant provided no factual support, other than his own self-serving claims, to prove that defense counsel failed to meet with him.  Further, the record establishes that both defense counsel and

defendant stated, at a hearing a month before the trial began, that they
had met at least once and had discussed the case at length the week
before. Defendant's claim is meritless.

Third, defendant alleges that defense counsel failed to investigate
defendant's recommended witnesses and thus, the trial court should
have appointed substitute counsel. Defendant asserts if his witnesses
were presented, their testimony would have established that the
prosecution witnesses were lying. Disagreements that are fairly
categorized as disputes over professional judgment and trial strategy
are matters entrusted to the attorney and thus, are not grounds for the
appointment of substitute counsel. A review of the record reveals
that defense counsel investigated some potential witnesses but was
hampered by incomplete information from defendant and limited
funds. We note that, at trial, it was asserted that these witnesses
would have testified to defendant's regular and unsupervised visits
with the victim and his other daughter after the abuse was revealed.
However, the prosecution conceded this point and both the victim and
her mother testified at trial that these unsupervised visits occurred.
Defendant does not explain how the additional testimony would have
been material to the proceedings or how the dispute over these
potential witnesses constituted a dispute over a fundamental trial
tactic rather than a dispute over defense counsel's professional
judgment to not to waste resources purs[u]ing these witnesses and her
trial strategy decisions with respect to the offered defense. The trial
court did not abuse its discretion when it denied defendant's requests
for substitute counsel.

*Widner*, 2009 WL 1693492 at *1-2 (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is

neither contrary to, nor involves an unreasonable application of, clearly established federal law.

Furthermore, this decision was not based on an unreasonable determination of the facts in light of

the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be

granted.

II.            **Introduction of Propensity Evidence**

As described above, Lynda Huffman testified that she did not learn of Petitioner's abuse of her daughter until an incident in 1997 in which, according to A.C., Petitioner again sexually assaulted her. Because this particular incident occurred while the family was residing in Washington state, Petitioner was not charged in this matter with a crime resulting from this incident. Petitioner argues that the introduction of testimony regarding this uncharged incident constituted improper propensity evidence that violated his due process right to a fair trial. Petitioner's claim fails for at least two reasons.

First, the United States Supreme Court has never held that a state violates a criminal defendant's due process rights when it permits the introduction of propensity evidence in the form of other bad acts evidence. *See Bey v. Bagley*, 500 F.3d 514, 520 (6th Cir. 2007). Second, Petitioner cannot establish that the introduction of the testimony in question deprived him of a fair trial.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized

14

that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).  Whether the admission of evidence constitutes a denial of fundamental fairness "turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Ege v. Yukins*, 485 F.3d 364, 375 (6th. Cir. 2007).

The Sixth Circuit has found that the improper introduction of evidence violated a criminal defendant's right to a fair trial where the challenged evidence was the only direct evidence linking the defendant to the crime.  *See Ege*, 485 F.3d at 374-78.  However, where there exists sufficient other evidence of guilt and the challenged evidence is only "peripheral to the case against" the defendant, the Sixth Circuit has found no due process violation.  *Collier v. Lafler*, 2011 WL 1211465 at *3 (6th Cir., Mar. 30, 2011).  The testimony concerning the 1997 incident following which Huffman first learned of Petitioner's abuse was, at most, only peripheral to the case against Petitioner.  The testimony by A.C. concerning the years of sexual abuse she suffered while residing in Michigan, the testimony by Lynda Huffman that Petitioner acknowledged sexually abusing A.C., and the testimony by James Widner that Petitioner admitted sexually assaulting A.C. was more than sufficient to establish Petitioner's guilt.

The Michigan Court of Appeals rejected this claim on two grounds.  The court first

15

observed that the testimony in question is expressly permitted under Michigan law.  *Widner*, 2009

WL 1693492 at *4.  The court further found that the introduction of this evidence did not deprive

Petitioner of a fair trial.  On this latter point, the court observed:

> Defendant also contends he was denied a fair trial because the testimony about the Washington State incident was unduly prejudicial.  MCL 768.27a allows for this type of evidence to be admitted, and it "may be considered for its bearing on any manner to which it is relevant."  However, even if the evidence is admissible pursuant to MCL 768.27a, the evidence must also be admissible pursuant to MRE 403.  MRE 403 states, in pertinent part, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ..."  MRE 403 does not prohibit the use of highly prejudicial evidence, but excludes unfairly prejudicial evidence.  "Unfair prejudice exists where there is danger that the evidence will be given undue or preemptive weight by the trier of fact, or when it would be inequitable to allow the use of such evidence."  Even though the evidence was prejudicial, the witnesses' testimony regarding this incident was highly probative to demonstrate defendant's continuing course of conduct with the victim, and it increased the likelihood he committed these charged offenses and bolstered the victim's credibility.  Its probative value was not outweighed by the danger of unfair prejudice.  Additionally, defendant's claim that the evidence was barred because it was propensity evidence is meritless.  MCL 768.27a specifically states evidence admitted pursuant to this statute may be used in any relevant manner.  Any manner includes demonstrating propensity.

*Id.* at *4 (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is

neither contrary to, nor involves an unreasonable application of, clearly established federal law.

Furthermore, this decision was not based on an unreasonable determination of the facts in light of

the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be

granted.

III.            **Failure to Appoint an Investigator**

On July 11, 2008, Petitioner moved in the trial court for a new trial based on ineffective assistance of trial counsel.  (Hearing Transcript, July 11, 2008, 11-26).  As part of this particular motion, Petitioner also requested that the trial court authorize funding to employ an investigator for the purpose of contacting potential witnesses with whom trial counsel failed to communicate.  (Tr. 20-21).  The trial court denied Petitioner's motion for new trial, including his request for funds to employ an investigator.  (Tr. 25-26).  Petitioner asserts that the trial court's failure to authorize funds to employ an investigator deprived him of the ability to factually develop certain claims he wished to pursue on appeal and, therefore, violated his right to due process.

In *Ake v. Oklahoma*, 470 U.S. 68 (1985), Glen Ake was charged with two counts of murder and two counts of "shooting with intent to kill."  *Id.* at 70, 72.  Ake's behavior at his arraignment and other preliminary hearings was "so bizarre" that the trial judge *sua sponte* ordered that Ake be examined by a psychiatrist.  *Id.* at 71.  Ake was subsequently diagnosed as "a probable paranoid schizophrenic" and it was also determined that Ake was not presently competent to stand trial.  *Id.*  No examination was made, however, of Ake's mental state when he committed the crimes in question.  *Id.* at 72.

Following six weeks of treatment, Ake was found competent to stand trial at which point the State resumed its prosecution.  *Id.* at 71-72.  Prior to trial, Ake's attorney notified the court of his intention to assert the defense that Ake was insane at time he committed the crimes in question.  *Id.* at 72.  In an effort to obtain assistance preparing and presenting such a defense, Ake's attorney "asked the court either to arrange to have a psychiatrist perform the examination, or to provide funds to allow the defense to arrange one."  Counsel's request was denied.  While Ake

17

maintained at trial that he was insane at the time he committed the crimes in question, "[a]s a result [of the trial judge's ruling], there was no expert testimony for either side on Ake's sanity at the time of the offense." *Id.* at 72. With respect to Ake's insanity defense, the trial judge instructed the jurors that Ake was "to be presumed sane at the time of the crime unless [Ake] presented evidence sufficient to raise a reasonable doubt about his sanity at that time." *Id.* at 72-73. Ake was convicted and sentenced to death. *Id.* at 72-73.

On appeal, Ake argued that "as an indigent defendant, he should have been provided the services of a court-appointed psychiatrist." *Id.* at 73. Ake's appeal was unsuccessful after which the United States Supreme Court agreed to hear the matter. *Id.* at 73-74. The Court first reaffirmed the long recognized principle that "when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Id.* at 76. The Court further observed that:

> while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system[.]"  To implement this principle, we have focused on identifying the "basic tools of an adequate defense or appeal," and we have required that such tools be provided to those defendants who cannot afford to pay for them.

*Id.* at 77.

In light of these principles and the facts of Ake's prosecution, the Court reversed Ake's conviction, holding that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise

afford one."  *Id.* at 74.

While the *Ake* Court invoked broad-based principles of fairness, its holding is expressly limited to circumstances in which a criminal defendant makes "a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial."  The limited nature of the *Ake* Court's holding is further supported by the fact that less than four months after deciding *Ake*, the Court declined to extend its *Ake* holding to the appointment of a criminal investigator, fingerprint expert, or ballistics expert and declined to address the question of "what if any showing would [entitle] a defendant to [private non-psychiatric] assistance" as a matter of federal constitutional law. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985).  Other courts have subsequently recognized that the Supreme Court has not extended the holding in *Ake* to cover the provision of investigators or other non-psychiatric experts.  *See, e.g., Hawkins v. Mullin*, 291 F.3d 658, 671 n.6 (10th Cir. 2002); *Weeks v. Angelone*, 176 F.3d 249, 264-65 (4th Cir. 1999).

Because the Supreme Court has not extended *Ake* to require courts to appoint or provide funding to secure non-psychiatric assistance, Petitioner cannot show that the failure to grant his request for an investigator on appeal was contrary to, or an unreasonable application of, clearly established Supreme Court authority.  For this reason, Petitioner's claim fails.  Furthermore, even if *Ake* were applicable to requests for investigators, the result is the same.

Petitioner asserted that he needed an investigator to establish the factual basis for his claim of ineffective assistance of trial counsel.  Specifically, Petitioner stated that he required the assistance of an investigator to establish that at the time of trial there existed witnesses, whose testimony his attorney failed to secure, who would have testified that "there was continuing contact

between [Petitioner] and his daughter, his biological daughter[2] all through this period, continuing unsupervised contact." (Hearing Transcript, July 11, 2008, 19).

As the *Ake* Court held, the government's obligation to provide a criminal defendant with certain "basic tools" is implicated only where the defendant first makes a "preliminary showing" that such tools are reasonably necessary. *See also*, *Caldwell*, 472 U.S. at 323 n.1 (where "petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision" to deny the defendant's request for expert assistance). Here, Petitioner failed to identify the witnesses in question and offered nothing more than unsubstantiated assertions concerning the testimony they would have provided. In light of such meager support, the trial court's determination that Petitioner had failed to demonstrate the necessity for the assistance of an investigator does not seem unreasonable. Furthermore, even if Petitioner's unsubstantiated assertions satisfy the "preliminary showing" requirement, the Court fails to discern how the alleged testimony of the witnesses in question would have appreciably advanced Petitioner's position.

Petitioner asserted that he needed the assistance of an investigator to establish that after he was confronted by Lynda Huffman in 1997, about his behavior with A.C., he continued to have contact with his daughter, Elizabeth. Lynda Huffman testified that after discovering that Petitioner had sexually abused A.C., she permitted Petitioner to visit their daughter, Elizabeth. (Trial Transcript, October 24, 2007, 75). Thus, Huffman conceded the primary point that Petitioner sought to make with the witnesses in question, namely that he continued to have contact with his daughter

---

[2] This refers to A.C.'s younger sister, Elizabeth, the child born to Petitioner and Lynda Huffman shortly after the two began their relationship.

Elizabeth after 1997.  The Court notes that while Huffman testified that the visits in question between Petitioner and Elizabeth were supervised, Petitioner asserted that his unidentified witnesses would have testified that such visits were unsupervised.  This alleged discrepancy is, in the Court's estimation, insignificant.  It bears on a tangential issue and given the overwhelming evidence of Petitioner's guilt, the Court finds that it is not reasonable to assert that the services of the requested investigator would have appreciably advanced Petitioner's appeal.  The Michigan Court of Appeals rejected Petitioner's claim:

> [D]efendant was not entitled to a court-appointed investigator to further investigate possible witnesses.  A court appointed investigator is not "automatically mandatory but rather depends upon the need as revealed by the facts and circumstances of each case."  The trial court has discretion to determine whether an indigent defendant has demonstrated that an investigator is necessary to ensure due process.  There is nothing in the record to support defendant's contention of need and his assertions about what the witnesses would testify to was pure conjecture.  Consequently, the trial court did not abuse its discretion when it denied defendant's request for an investigator.

*Widner*, 2009 WL 1693492 at *3 (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.        Ineffective Assistance of Counsel**

Petitioner argues that he is entitled to relief because his trial counsel rendered

constitutionally deficient performance.   Specifically, Petitioner asserts that his trial counsel's performance was deficient in the following ways: (1) counsel was "unprepared for cross-examination," (2) counsel failed to challenge the admissibility of propensity evidence, and (3) counsel failed to investigate and subpoena certain witnesses.   Petitioner further argues that he is entitled to relief on the grounds that he was completely deprived of the assistance of counsel.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.   *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011).  To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."   *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).   A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."   *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [she] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."   *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.   Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).   The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."   *Premo*, 131 S.Ct. at 739 (quoting *Strickland*,

466 U.S. at 690). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 131 S.Ct. at 740. Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Id.* (citations omitted). As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).


A.    Cross-Examination

Petitioner asserts that his trial attorney failed to secure certain documents, the contents of which "would have directly contradicted the testimony of the complaining witnesses." Specifically, Petitioner asserts that in a 2000 police report, Lynda Huffman referred to Petitioner as a "very good father." Petitioner also alleges that other documents establish that subsequent to 1997, Petitioner continued to maintain contact with his daughter, Elizabeth.

As previously discussed, the prosecution did not dispute that Petitioner continued to

maintain contact with his daughter after 1997 and, in fact, presented testimony that such was the case.  The Court fails to discern how counsel can be faulted for failing to secure documents concerning uncontested (and only marginally relevant) facts.  As for the alleged police report in which Huffman referred to Petitioner as a "very good father," such is not contained in the record.  Thus, the Court cannot evaluate the entire statement in question or, more importantly, the context in which it was made.  The Court is not persuaded that even had counsel cross-examined Huffman about the statement in question that the outcome in this matter would have been any different.  The Michigan Court of Appeals rejected this particular claim on the ground that Petitioner had failed to demonstrate that he was prejudiced by counsel's alleged shortcoming.  *Widner*, 2009 WL 1693492 at *3.  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

### B.    Failure to Challenge Propensity Evidence

Petitioner next argues that his trial counsel was ineffective for failing to challenge the admission of the alleged propensity evidence detailed in Section II above.  As discussed above, admission of the evidence in question did not deprive Petitioner of a fair trial and, moreover, was properly admitted under Michigan law.  The failure of an attorney to object to properly admitted evidence does not constitute ineffective assistance of counsel.  The Michigan Court of Appeals rejected this claim.  *Widner*, 2009 WL 1693492 at *2-3.  In light of the above authority and facts,

24

the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.      Failure to Investigate and Subpoena Witnesses

Petitioner next faults his attorney for failing to investigate and subpoena for trial certain unidentified "witnesses."  Petitioner asserts that prior to trial he provided his attorney with a list of potential witnesses. Petitioner asserts that the witnesses in question would have testified that he "was a good father" and "regularly had unsupervised contact with his daughter until just before the allegations [that he sexually abused A.C.] surfaced."

This topic was addressed by the trial judge at the outset of trial.  With respect to her investigation of Petitioner's list of witnesses, counsel indicated that she met with Petitioner and "brainstormed" concerning his list and the most effective and efficient way to employ her not unlimited resources.  (Trial Transcript, October 24, 2007, 13).  Counsel stated that Petitioner instructed her to contact those individuals from the list that "would be the easiest ones to find." (Tr. 13).  Counsel followed Petitioner's instructions and was able to locate several potential witnesses. (Tr. 13). Counsel further indicated that with respect to the remaining individuals on Petitioner's list, she made a strategic decision to focus her efforts on other aspects of Petitioner's defense.  (Tr. 13).

Petitioner concedes that his attorney contacted many of the individuals on the list, but nevertheless faults counsel for failing to contact each and every one of the individuals on his list. Petitioner has failed to identify the individuals in question or indicate with any specificity what

testimony or evidence they may have been able to provide. Furthermore, Petitioner concedes that "some of the witnesses may not have proved to be very helpful, or may have been cumulative, or may have been positively harmful if actually called, or could not be found."

It is well recognized that counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Strickland*, 466 U.S. at 691). The decision by an attorney not to investigate must be assessed for "reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgments." *Towns*, 395 F.3d at 258 (quoting *Strickland*, 466 U.S. at 691). The relevant question "is not whether counsel's choices were strategic, but whether they were reasonable." *Towns*, 395 F.3d at 258 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000)). It must be noted, however, that the Supreme Court has also made clear that "the Sixth Amendment does not require that counsel do what is impossible." *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984).

In the Court's estimation, counsel's conduct was reasonable under the circumstances. Petitioner provided counsel with a list of names that he wanted her to investigate. Petitioner concedes, however, that he had no idea whether the individuals in question could offer any evidence favorable to his cause or would instead "have been positively harmful" to his defense. Nevertheless, counsel met with Petitioner to discuss the matter and proceeded in the manner Petitioner directed, contacting those individuals that were the "easiest" to locate. After doing so, counsel made a strategic decision to focus her efforts elsewhere.

Petitioner is essentially faulting his attorney for failing to go off on an investigatory wild goose chase. While Petitioner was not necessarily required to provide counsel with a detailed

description of what evidence the individuals on his list might offer, likewise "counsel need not chase

wild factual geese when it appears, in the light of informed professional judgment, that a defense is

implausible or insubstantial as a matter of law, or. . .as a matter of fact and of the realities of proof,

procedure, and trial tactics." *Rodriguez-Santana v. United States*, 2006 WL 2471515 at *5 (D.

Puerto Rico, Aug. 24, 2006).   Considering that, by Petitioner's own admission, the individuals on

his list would have, at best, offered testimony on clearly tangential issues, counsel's decision to not

further investigate the individuals on Petitioner's list, and instead focus her efforts elsewhere, is quite

reasonable.   The Michigan Court of Appeals rejected this claim on the following grounds:

> [D]efendant alleges defense counsel's failure to investigate and
> subpoena witnesses that defendant requested denied him effective
> assistance of counsel because the witnesses would have proved he
> was a good father and that he had regular and unsupervised visits
> with his own daughter in the years after the abuse of the victim
> was revealed.  "Failure to make a reasonable investigation can constitute
> ineffective assistance of counsel."  "A defendant is entitled to have
> his counsel prepare, investigate, and present all substantial defenses."
> "A substantial defense is one that might have made a difference in the
> outcome of the trial."   However, "[d]ecisions regarding what
> evidence to present and whether to call or question witnesses are
> presumed to be matters of trial strategy."   Because defendant's
> daughter was not the victim in this case and because the victim and
> her mother both testified to these visits at trial, defendant has not
> demonstrated he was denied a substantial defense by the absence of
> the witnesses.  Additionally, we note that the Sixth Amendment does
> not require the counsel to do what is impossible.  Given the age of the
> victim's allegations, the lack of full identifying and contact
> information of the potential witnesses, the limited budget of the
> Public Defender's Officer and defendant's suggestion that defense
> counsel canvass a neighborhood and/or make unsolicited telephone
> calls to locate the potential witnesses, it appears defendant expected
> defense counsel to do the impossible.  Defendant has failed to
> establish that he was denied effective assistance of counsel.

*Widner*, 2009 WL 1693492 at *3 (internal citations omitted).

27

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

### D. Deprivation of Counsel

Finally, Petitioner argues that he is entitled to relief because he "suffered a constructive denial of counsel during the critical pretrial period." Specifically, Petitioner alleges that while "he in theory had the entire Kent County Public Defender Officer representing him, none of them took the time to actually sit down and consult with him about his witnesses or other aspects of his case" prior to trial.

The right of a criminal defendant to be effectively represented by counsel is well established.  Without the effective assistance of counsel, "the right to a trial itself would be of little avail."  *United States v. Cronic*, 466 U.S. 648, 654 (1984).  As the *Cronic* Court observed:

> Thus, the adversarial process guaranteed by the Sixth Amendment's right to trial requires that the accused have "counsel acting in the role of an advocate."  The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing.  When a true adversarial criminal trial has been conducted - even if defense counsel may have made demonstrable errors the kind of testing envisioned by the Sixth Amendment has occurred.  But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.

*Id.* at 656-57 (internal citations omitted).

28

Generally, to demonstrate a violation of the right to the effective assistance of counsel, a criminal defendant must demonstrate that his attorney rendered deficient performance and that he suffered prejudice resulting therefrom.  *Id.* at 658; *see also, Strickland*, 466 U.S. at 687.  As the *Cronic* Court further observed, "there are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658.  In other words, in certain circumstances, a court must simply presume that a defendant suffered prejudice, of a constitutional magnitude, as a result of his attorney's deficient performance. *Id.* at 658-61.

This presumption may arise in three types of circumstances: (1) when the accused is denied the presence of counsel at a critical stage of the proceedings; (2) when counsel does not subject the prosecution's case to any meaningful adversarial testing; and (3) when counsel is placed in circumstances in which competent counsel very likely would be unable to render effective assistance. *See Henness v. Bagley*, 644 F.3d 308, 323 (6th Cir. 2011) (citing *Bell*, 535 U.S. at 695-96).  The presumption of prejudice recognized in *Cronic*, however, is a "narrow exception" to the actual prejudice requirement under *Strickland*. *Florida v. Nixon*, 543 U.S. 175, 190 (2004). Petitioner asserts that he is entitled to the presumption of prejudice and, therefore, relief, because he "suffered a constructive denial of counsel during the critical pretrial period."

It is well accepted that the "pre-trial period" constitutes a "critical period" for purposes of the *Cronic* analysis because it is during the pre-trial period that counsel is obligated to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Mitchell v. Mason*, 325 F.3d 732, 743 (6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 691).  Naturally, if counsel fails to consult with her client during the critical

pre-trial period, she cannot fulfil her duty to reasonably investigate matters.  *Mitchell*, 325 F.3d at 743 (citing *Strickland*, 466 U.S. at 691).  A complete failure by an attorney to ever meet or consult with her client during the critical pre-trial period would constitute a deprivation of counsel sufficient to invoke the *Cronic* prejudice presumption.

It is not clear whether Petitioner is asserting a claim that he suffered an *actual* denial or a *constructive* denial of counsel during the pre-trial period.  While Petitioner states that he "suffered a constructive denial of counsel during the critical pretrial period," he also asserts that his attorney did not "t[ake] the time to actually sit down and consult with him" prior to trial.  To the extent that Petitioner is asserting that suffered an actual denial of counsel, such is belied by the record.  As discussed above, the record reveals that counsel did, in fact, meet with Petitioner during the pre-trial period to discuss strategy and tactics.  To the extent that Petitioner asserts that he suffered a constructive denial of counsel, such is likewise belied by the record.

To prevail on a constructive denial of counsel claim, Petitioner must demonstrate that his attorney "entirely fail[ed] to subject the prosecution's case to a meaningful adversarial testing." *Mykolaitis v. Howes*, 2011 WL 3624949 at *37 (E.D. Mich., June 28, 2011) (quoting *Cronic*, 466 U.S. at 659).  As the Supreme Court has made clear, however, to fit within this exception "the attorney's failure must be complete."  *Bell*, 535 U.S. at 697.  In other words, Petitioner must establish that he received "no lawyering" and not simply "bad lawyering," as conduct falling within the latter category is analyzed under the familiar *Strickland* framework (i.e., Petitioner must demonstrate prejudice).  *Mykolaitis*, 2011 WL 3624949 at *37 (citations omitted).

The record fails to support any claim that Petitioner's attorney failed to subject the prosecution's case to meaningful adversarial testing.  *See Id.* (where counsel "cross-examined

30

prosecution witnesses, objected to evidence, and presented opening and closing arguments," petitioner cannot demonstrate that he suffered a constructive denial of counsel and must instead satisfy "the *Strickland* framework"). The Michigan Court of Appeals rejected this claim:

> Defendant additionally claims that he was entitled to a presumption of prejudice pursuant to *Cronic*, because of defense counsel's absence during the pretrial period. "The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." The right to counsel does not entitle a defendant with unlimited access to the attorney. A review of the record indicates defense counsel met with defendant while he was in jail to discuss defendant's case and that defense counsel stated she was prepared for trial and acted appropriately during the trial. Thus, defendant has failed to establish the factual predicate that defense counsel was completely absent during a critical stage of defendant's trial.

*Widner*, 2009 WL 1693492 at *4 (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## V.        Failure to Conduct an Evidentiary Hearing

Petitioner asserts that the trial court violated state law by failing to conduct a hearing on his ineffective assistance of counsel claim. The federal courts can only consider habeas claims alleging violations of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). Petitioner's claim rests upon a perceived violation of state law, therefore, relief is available only if

the alleged error deprived Petitioner of "fundamental fairness in the trial process."  *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993); *see also*, *Stradley v. Lafler*, 2012 WL 2374648 at *5 (E.D. Mich., June 22, 2012) (same).  Petitioner has failed to demonstrate that his right to a fair trial was denied and the record belies any such claim.  Moreover, as previously discussed, Petitioner's ineffective assistance of counsel claim is without merit.  Accordingly, this claim raises no issue on which habeas relief may be granted.

## VI.        Sentencing Claims

Finally, Petitioner asserts two claims relating to his sentence.  Petitioner asserts that the trial judge incorrectly scored several of the relevant offense variables resulting in an inaccurate sentencing guidelines score.  Petitioner also asserts that the trial judge "enhanced" his sentence on the basis of "factual findings not found by the jury beyond a reasonable doubt" in violation of the Supreme Court's holding in *Blakely v. Washington*, 542 U.S. 296 (2004).

First, to the extent that Petitioner asserts that the scoring of the relevant offense variables is inaccurate in violation of Michigan law, such claim is not cognizable.  *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging "violation of the Constitution, laws, or treaties of the United States"); *Coleman v. Curtin*, 425 Fed. Appx. 483, 484-85 (6th Cir., June 6, 2011) (claims that a state court improperly calculated the relevant offense variables is not cognizable in a federal habeas proceeding).  Petitioner's reliance on *Blakely* is equally unavailing.

In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Id.* at 301

(quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).  Petitioner asserts that his sentence violates this rule because the trial judge relied upon facts which were neither admitted nor proven beyond a reasonable doubt when scoring several of the offense variables.

In *Blakely*, the defendant pleaded guilty to second degree kidnaping involving domestic violence and use of a firearm.  *Blakely*, 542 U.S. at 298-99.  In so doing, Blakely admitted "the elements of second-degree kidnaping and the domestic-violence and firearm allegations, but no other relevant facts."  *Id.* at 299.  Washington law provided that the "standard range" to which a defendant, convicted of this particular offense, could be sentenced was 49-53 months.  However, the sentencing court was permitted to impose a sentence in excess of the "standard range" if it found "substantial and compelling reasons justifying an exceptional sentence."  Before imposing an "exceptional sentence," the sentencing court was required to "set forth findings of fact and conclusions of law supporting it."  *Id.*

The State recommended that Blakely receive a "standard range" sentence of 49-53 months.  *Id.* at 300.  The sentencing court rejected this recommendation, however, and, finding that Blakely acted with "deliberate cruelty," imposed an "exceptional" sentence of 90 months.  *Id.* at 300-01.  As the *Blakely* Court recognized, under Washington law, the court "could not have imposed the exceptional 90-month sentence solely on the basis of the facts admitted in the guilty plea," but instead could do so only based on the court's additional determination that Blakely acted with "deliberate cruelty."  *Id.* at 304.  The Court held, therefore, that this sentence violated Blakely's Sixth Amendment right to trial by jury because it was predicated on facts that were neither admitted by Blakely nor found by a jury.  *Id.* at 301-05.

The *Blakely* Court, however, made clear that its holding applied only to "determinate-

sentencing schemes" such as that employed by the State of Washington. *Id.* at 308-09. The Court recognized that *indeterminate* sentencing schemes do not run afoul of the Constitution because while such schemes may sanction "judicial discretion" in sentencing, they do not accomplish such "at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty." *Id.* at 308-09. As the Court recognized:

> Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence - and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence - and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

*Id.* at 309.

As is well recognized, the State of Michigan employs an indeterminate sentencing scheme. *See, e.g., Montes v. Trombley*, 599 F.3d 490, 497 (6th Cir. 2010); *Porter v. Bauman*, 2011 WL 3501814 at *5 (W.D. Mich., Aug. 10, 2011).

Petitioner was convicted of three counts of First Degree Criminal Sexual Conduct and three counts of Second Degree Criminal Sexual Conduct. Under Michigan law, conviction for First Degree Criminal Conduct is punishable by imprisonment for "life or for any term of years." *See* Mich. Comp. Laws § 750.520b(2). Petitioner received a sentence of 40-60 years in prison which is entirely consistent with Michigan law. Thus, when Petitioner committed his crimes he knew that he could possibly receive a sentence of this magnitude. Because Petitioner received a sentence

within the range permitted by Michigan law as a result of his convictions, any additional fact-finding in which the trial court may have engaged did not violate Petitioner's rights under *Blakely* or the Sixth Amendment.  Thus, this claim raises no issue on which habeas relief may be granted.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Widner's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  August 1, 2012                            /s/ Ellen S. Carmody
                                                 ELLEN S. CARMODY
                                                 United States Magistrate Judge

35